IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| Deago Buck, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| Goyim Defense League, Jon Minadeo II, | ) | |
| Ryan Scott McCann, Nicholas Alan | ) | |
| Bysheim, Louie Dunn, Colby Alexander | ) | |
| Franks, Zane Fenton Morris, and John | ) | |
| Does 1-10, | ) | |
| *Defendants* | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Deago Buck ("Plaintiff" or "Buck"), through undersigned counsel, upon knowledge as to himself and his actions and upon information and belief as to all other matters, respectfully alleges as follows:

### INTRODUCTION

1. In July 2024, a group of neo-Nazis traveled to Nashville, Tennessee with the express purpose of conducting a campaign of harassment, threats, intimidation, and violence against people who were, or were perceived to be, Black or Jewish. The group were members of the Goyim Defense League ("GDL"), a white supremacist organization whose mission is to intimidate and terrorize Jewish people and people of color for the purpose of depriving them of equal protection and other rights that they are guaranteed under state and federal law.

2. GDL and more than a dozen of its members targeted the Black and Jewish communities in Nashville during the first phase of their campaign. For ten days in July, they carried through on their plans of violence and intimidation, including marauding through town waving swastika flags,

threatening people, screaming racist and antisemitic slurs, and obscenities in people's faces, harassing a group of Black children, littering lawns with antisemitic propaganda, disrupting a public city council meeting, and viciously assaulting two young men because of their perceived race and/or Jewish ancestry.

3. This lawsuit seeks to hold GDL and certain GDL members accountable for the racially motivated harassment, threats, intimidation, and violence in which they engaged in furtherance of their conspiracy to target people based on skin color, race, and/or religion, for the purpose of depriving them of their rights to equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, including the right to be free from racial violence and the right to access places of public accommodation, because of their race or religion.

4. GDL kicked off their campaign by convening in Nashville, as they have in cities across the country, in order to further their conspiracy by, among other activities, violently and physically confronting, provoking, harassing, intimidating, and assaulting people who are, or who they perceive to be Jewish, Black, or otherwise not members of "the White race," to illegally spread antisemitic propaganda, and to use footage of the violence, harassment, intimidation, and assaults to further harm their victims through their online platforms ("Intimidation Tours").

5. As shown in the following picture, the dangerous and violent nature of GDL was on graphic display during its Intimidation Tour in Nashville, where its founder, figurehead, and leader, Defendant Jon Minadeo II ("Minadeo"), was captured on video attempting to gouge the eyes of Plaintiff, a young biracial man, during a coordinated attack that Minadeo orchestrated as part of GDL's conspiracy to violate the civil rights of Black and Jewish people in Nashville:



*Image 1 - Defendant Minadeo gouging into Plaintiff's eye socket*

6.    GDL photographed and livestreamed the racism and antisemitism that animated their violence in Nashville. The following image from a video is an example of the type of content GDL generated during their tour. It shows GDL members celebrating with Heil Hitler salutes (also known as Roman salutes or "Romans") and "White Power" chants after an unprovoked attack on a young man of Jewish descent:



*Image 2 – Defendants Doe 1, McCann, and Franks celebrate after an unprovoked assault*

7.    The ongoing conspiracy continued after the initial 10-day Intimidation Tour ended, with death threats by GDL members directed to and about Plaintiff, his family, his employer, and

to others seen as sympathetic to multiculturalism, including the Davidson County District Attorney. For example, GDL members in person and on GDL platforms:

- Encouraged others and/or threatened to "jump" Plaintiff after his work shifts, to "curb stomp," "beat" and "repeatedly" shoot him. For example:





;

- Made death threats against the Davidson County District Attorney, as reflected in these exhibits used to convict a GDL member for communicating a threat in interstate commerce:





PHOTO CREDIT: UNITED STATES V. DAVID AARON BLOYED, CASE 3:24-MJ-2295. DOCUMENT 1, FILED 09/20/24.;

- Threatened to start "WW3" by targeting Nashville:

**Schwetty Balls**     14:56
Tennessee could get worked up enough to take Nashville. We need WW3 to start in TN and make Nashville the target. Flyercaust TN! Jew poulations in TN: Memphis (almost 9,000) and Nashville (close to 6,000)

; and

- Trespassed on private property at which Jewish community members congregate in order to intimidate and terrorize them.

8. Plaintiff brings this case against GDL, its leadership, and certain GDL members responsible for, or conspiring in, the campaign to assault, harass and intimidate the Jewish and Black communities of Nashville. Plaintiff alleges that Defendants violated the Ku Klux Klan Act of 1871, which was designed to prevent precisely the kind of conspiratorial racist activity that Defendants perpetrated in this case. Plaintiff additionally alleges that Defendants engaged in assault, battery, malicious harassment, and conspiracy. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief.

## JURISDICTION AND VENUE

9. The Court has subject-matter jurisdiction over this action because it arises under federal law, including Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). It has jurisdiction over the state law claims because they are so closely related to the federal claims as to form part of the same case or controversy. 28 U.S.C. §§ 1331, 1367.

10. The Court has personal jurisdiction over Defendants in this action because all Defendants committed the harms in Davidson County, Tennessee.

11. Venue is proper because the events giving rise to this action occurred in the Middle District of Tennessee. 28 U.S.C. § 1391(b)(2).

## PARTIES

12. Plaintiff Deago Buck is a resident of Tennessee.

13. At the time of the events described herein, Buck was a 19-year-old employee of Johnny Cash's Bar & BBQ in downtown Nashville.

14. Defendant GDL is an unincorporated association of white supremacists whose mission includes declaring war on Jewish people with the goal of exterminating and/or expelling them from the United States and Europe, subjecting Jews and people of color to harassment, intimidation and violence for the purpose of creating "white nations," and enlisting recruits to aid in achieving these objectives.

15. GDL is also a hate-for-profit enterprise that uses racism and antisemitism in combination with confrontation, provocation, harassment, intimidation and violence as tactics for monetary gain. GDL, via its online products GoyimTV ("GTV"), and the GoyimTV Shop, and GTV Flyers, engages in online commerce grounded in white nationalism and antisemitism across the United States, including in the Middle District of Tennessee, with its principal operations in Greene County, Missouri. GTV is a former California limited liability company that continues to operate as an unincorporated business.

16. GDL conducted business in Tennessee throughout 2024 and continues to do so by performing many of the acts for which it was formed, including marketing and selling its products and recruiting members and donations via GTV, and targeting Tennesseans who are, or are perceived to be, Jewish, people of color, and/or not members of "the White race" for harassment, intimidation, and/or violence and streaming or posting videos of such harassment and intimidation for "donations."

17. Defendant Minadeo is domiciled in Greene County, Missouri. He is the co-founder, and a leader, director, managing agent, and/or a member of GDL. Minadeo is, or acts in the capacity as, GDL's president and chief executive officer of the association. He owns, in full or in part, GTV.

18.   Defendant Ryan Scott McCann ("McCann") is domiciled in Ontario, Canada. He is a member and/or associate of GDL. He is currently detained at the Davidson County Downtown Detention Center in Davidson County, Tennessee because of charges related to the conspiracy identified herein and his involvement in GDL's targeting of Nashville's Black and Jewish communities.

19.   Defendant Nicholas Alan Bysheim ("Bysheim") is domiciled in Calvert County, Maryland. He is a member and/or associate of GDL.

20.   Defendant Louie Dunn ("Dunn") is domiciled in Oklahoma County, Oklahoma. He is a member and/or associate of GDL.

21.   Defendant Colby Alexander Franks ("Franks") is domiciled in Hardin County, Tennessee. He is a member and/or associate of GDL.

22.   Defendant Zane Fenton Morris ("Morris") is domiciled in Volusia County, Florida. He is a member and/or associate of GDL.

23.   Defendants John Does 1-10 are members and/or associates of GDL who participated in the conspiracies set forth herein, whose identities are currently unknown.

24.   All Defendants travelled to and were present in Nashville, Tennessee and participated in the conspiracy described herein and the damages suffered by Plaintiff.

## FACTUAL ALLEGATIONS

### A.  Background

25.   Goyim Defense League is an unincorporated association of persons united by common interests or goals to intimidate, harass, threaten, and commit violence towards people who are, or appear to be, Jewish, Black, and/or otherwise are perceived by them as not members of "the White race." GDL's ranks include white supremacists and neo-Nazi adherents and provocateurs.

26.   GDL limits membership based on alignment with its ideology.

### i.   GDL Leadership Structure

27.   GDL was founded, managed, and otherwise directed and organized by Minadeo, who is, and who functions as, the chief operating officer or other managing officer, the managing agent, and/or a director of the association.

28.   GDL leadership includes Minadeo as well as several other avowed white supremacists.

29.   Minadeo directs GDL and its members, organizes and leads Intimidation Tours, which he offensively calls "Name the Nose Tours"[1] (NTNT), publishes on, profits from, and helps run GTV and the Goyim Shop.

30.   Other leaders of GDL helped found the organization. They create, manage, and profit from GTV, and are active in GDL's intimidation campaigns.

31.   At least one of Minadeo's fellow leaders of GDL refers to GDL members as his "army."

### ii.   GDL's Mission, Goals, and Business Purposes

32.   GDL's mission is to intimidate, threaten, and harass people who are or are perceived to be Black or Jewish, among other races that GDL considers "Anti-European." ("Black or Jewish").

33.   GDL's goals include extermination of the Jewish "problem" or race, and ridding all countries, except those in Africa, of Black people.

34.   The mission, goals, and objectives of GDL are reflected in Minadeo's public statements,[2] which include:

---

[1] This is a reference to an antisemitic trope regarding the noses of Jewish people used by antisemitic individuals and groups, including Nazis during Hitler's regime. See, e.g., Antisemitism: An Introduction, U.S. HOLOCAUST MEM'L MUSEUM, https://encyclopedia.ushmm.org/content/en/article/antisemitism (Jan. 10, 2025); *Nazi Conspiracy and Aggression Volume IV, Document No. 1778-PS* (a collection of "Documents in Law, History, and Diplomacy," partial translation of document 1778-ps, Nazi propaganda) available at <https://avalon.law.yale.edu/imt/1778-ps.asp>. *And see* n. 4, *infra*.

[2] Redactions inserted by counsel for Plaintiff.

- "Put your face where I can shoot it, n****r."

- "These N****RS need to get the f*ck out of our country"

- "Now its our turn to kick the jews and n****s back to their homes!"

- "It's Time For These Jews & Their Shit Skins[3] to Feel the WRATH OF THE ARYAN AWAKENING!"

- "WAKE UP WHITEY! IT'S TIME TO FIGHT!"

- "JEWS WERE NEVER SUPPOSED TO BE ALLOWED IN AMERICA THEY ARE MONGRELS FROM SATAN'S NUT SACK! THEY ARE NOT EUROPEAN. SO EVERY LAST JEW ON OUR SOIL NEEDS TO PACK IT THE F*CK UP AND GO! #F*ckAllJews."

- "YOU JEWS BETTER PACK IT THE F*CK UP REAL SOON ! BECAUSE WHEN AMERICA WAKES UP... IT'S F*CKING OVER ! I CAN'T WAIT…"

- "See you later, Jew. We're gonna expel you!"

35. GDL's violent mission and objectives are also evident in the merchandise they sell in support of their aims including, for example, t-shirts with the slogan "Gas the Jews With Us" and "Voting Will Not Remove Them."

36. GDL has utilized violence, intimidation, and harassment against numerous Tennesseans in pursuit of its objectives and business over the past year.

37. GDL uses the term "goyim," a Hebrew and Yiddish word to describe non-Jews. GDL perpetuates the false stereotypes that Black people are responsible for most crimes, that Jewish persons are deceitful and predatory and are behind an economic, political, and social scheme to

---

[3] GDL, and other white supremacists, use the insult "shitskin" to refer to people of color.

undermine white people and are responsible for bringing Black people and migrants to "white" countries; and that white people are superior.

38.    At least a dozen individuals affiliated with GDL have been arrested, charged, and convicted of crimes committed while participating in GDL conspiracies, activities and aims over the last four years. This includes the group's leader, Minadeo, who was sentenced to 30 days imprisonment for criminal littering of antisemitic flyers in West Palm Beach, Florida, and who was banned from Bibb County, Georgia for taking part in GDL activities.

39.    At least two shootings, with three victims, including one at Antioch High School in Nashville, Tennessee, have been tied to antisemitic propaganda distributed by GDL.

### iii.    Intimidation Tours

40.    GDL has a history of unleashing neo-Nazi havoc in communities by descending upon a city, engaging in menacing conduct designed to intimidate people based on race and/or religion; chanting or otherwise directing insults at people who are, or are perceived to be LGBTQ, Jewish, and/or not members of "the White race." Such insults include threatening statements like "Jews will not replace us," "Jews get the rope," "White Power," and "Heil Hitler." They also directly confront, provoke, and threaten people in an effort to engage in violence motivated by race or religion; wave swastika flags, litter Jewish neighborhoods and synagogues with antisemitic flyers in plastic bags weighted down with corn, rocks, rat poison, or pellets that resemble rat poison. These activities are often conducted as part of Intimidation Tours. The purposes of the Intimidation Tours are both commercial and sinister.

41.    The purposes include targeting people they believe to be Jewish or Black for harassment, intimidation, and to engage in violence against them, to further GDL's goal to "exterminate" and/or "expel" people who are Jewish or Black from the United States. For instance,

during Nashville's Intimidation Tour, there were at least two victims viciously attacked based on their perceived racial identities. During an Intimidation Tour in Orlando in February 2022, a Jewish student was spit on, punched, kicked, sprayed with a chemical agent and had his phone stolen and destroyed.

42. Another purpose of the tours is to generate content of the acts of harassment and intimidation that can then be shared and used to further harass and intimidate victims online as well as for GDL's commercial gain and recruitment.

43. GDL's activities targeting the Nashville community led to criminal charges against McCann and other GDL members. The criminal charges GDL members face for their Nashville campaign include assault, aggravated assault, criminal trespass, and intimidation in violation of civil rights. Still another GDL member was recently convicted in the United States District Court for the Middle District of Tennessee for making interstate threats against the duly-elected District Attorney of Nashville and Davidson County.

44. GDL members follow and mimic the actions, intimations, and directions of their leader and founder, Minadeo, to assault bystanders with intimidating and aggressive racist and antisemitic slurs, to infiltrate Jewish communities and buildings while disguised as a rabbi or Jewish person for the purpose of intimidating and threatening their victims, and to film the encounters in order to publish them on GTV to further the harassment and intimidation.

45. Individuals who appear to be members of "the White race" that are approached by GDL members during their Intimidation Tours and who do not join them or dare to demonstrate opposition are aggressively approached and/or surrounded, provoked, harassed, intimidated and assaulted, accused of being "race-traitors," "faggots," or Jews.

#### iv.    GDL's Business Purposes

46.    GDL conducts their business through the ownership and operation of the video website GTV, which livestreams and publishes GDL-created videos, and GoyimTV Shop, which is promoted through GTV and sells white supremacist and antisemitic products. On GTV, GDL engages in a hate-for-pay scheme in which they publish white supremacist and antisemitic content and broadcast "IRL" or "in real life" activities that includes live footage of racially or religiously motivated harassment, intimidation, threats, and/or assaults on its victims. GDL and its members use GTV to solicit "donations" in support of their confrontations, harassment, intimidation, and violence against Jewish and people of color and their supporters, and those viewed as not members of "the White race."

47.    GTV, as an asset and instrumentality of GDL, is both a platform and content provider for GDL and its members. It is used to collect money by filming and sharing incidents of provocation and harassment by GDL members. It allows followers to pay for an opportunity to get recognized by GDL leaders and other white supremacists during livestreams, and those payments are in turn used to fund further racist and antisemitic intimidation, provocation and harassment. It also provides a platform to sell racist and antisemitic merchandise that GDL creates and markets—like GDL-branded antisemitic flyers, Hitler masks, and "swastika soap."

### B. Defendant's Conspiracy to Harass, Threaten, Intimidate, Provoke, and Engage in Racially or Religiously Motivated Violence in Nashville

48.    Defendants organized, directed and otherwise planned the Nashville Intimidation Tour, using GDL channels of communication prior to their arrival in Nashville on or about July 12, 2024.

49.    GDL members stayed at a rental home in Kentucky and traveled to and from the home in a 15-person van during the Nashville Intimidation Tour, where they continued to plan and agree to their conspiracy.

50. The Nashville Intimidation Tour was their sixth so-called "Name the Nose Tour." It was attended by approximately twenty-five GDL members and/or associates.

**C. GDL's July 13 Antisemitic Attack on a Young Man of Jewish Descent**

51. On the evening of July 13, 2024, more than a dozen members of GDL, including McCann, Dunn, Minadeo, Franks, and Does 1-7 gathered in a parking lot on or near 9th Avenue South in Nashville.

52. The parking lot at 905 Clark Place was a place of public accommodation.

53. There, they encountered two young men. One of the young men was, or appeared to be, white and the other was a 20-year-old man of Jewish descent ("young man" or "young man of Jewish descent").

54. The GDL members surrounded the young man of Jewish descent, who was standing next to the open door of the driver's seat. In furtherance of their conspiracy to interfere with the rights of people perceived by them to be Jewish, McCann, Dunn, Minadeo, Franks, and Does 1-7 surrounded the young man and began to antagonize, harass, intimidate, and attempt to provoke him into a confrontation.

55. The young man was targeted based on his actual or perceived status as a Jewish person. Dunn and Doe 1 commented about "the six in the nose"—an antisemitic slur originating during Nazi Germany. This slur was popularized by, among others, Julius Streicher (publisher of the Nazi propaganda newspaper *Der Stürmer*) as part of Nazi propaganda including the "anti-Jewish propaganda book titled *Der Giftpilz*" (The Poisonous Mushroom) that claimed Jewish people can be identified "by his nose. The Jewish nose … looks like the number six. We call it the 'Jewish six.'"[4]

---

[4] *See*, *e.g.*, *Julius Streicher*, U.S. HOLOCAUST MEM'L MUSEUM,
https://encyclopedia.ushmm.org/content/en/gallery/julius-streicher (last visited June 11, 2025).

56. GDL members surrounded him and mocked him. Does 2-3 made antisemitic comments, including about him "fucking" and "sucking Bibi [Netenayahu]'s dick," a reference to the Prime Minister of Israel.

57. The young man asked his friend if they could "roll out," but Minadeo remained in the vehicle's doorway, impeding the driver's ability to close the door, while making antisemitic statements.

58. Minadeo, Dunn, Franks, and Does 1-7, still surrounding the young man, hurled insults, mocked him, refused to back away from him and his vehicle, laughed at his requests to be left alone, and continued to provoke and intimidate him, all while filming the interaction.

59. The provocation, harassment, and intimidation continued for nearly ten minutes. The young man was surrounded by more than a dozen neo-Nazis, including Minadeo, McCann, Dunn, Franks, and Does 1-7.

60. The young man maintained a calm demeanor but eventually directed them to "get away" from him and the vehicle. Defendants refused.

61. While GDL members and/or associates surrounded the young man, Does 4-5 goaded him to touch McCann, saying "that's all we need is for you to just touch him." McCann stood in front of the young man and invited him "to lay your hands on me, punch me, poke me, whatever you want," assuring the young man that he did not know how to fight. The young man remained unthreatening.

62. Without warning, McCann suddenly spun around to gain momentum and violently struck the young man in the face and neck with his elbow, using the full force of his body weight, even though the young man was standing in front of McCann in an unthreatening and unsuspecting manner.

63. As soon as McCann began the assault, Minadeo directed his members: "Here we go."

64. As the young man tried to get away, McCann kicked him several more times.

65. Dunn, who easily outweighed the young man by approximately 100 pounds, as shown in Image 3, grabbed the young man and body-slammed him against the truck. Minadeo, McCann, and Does 1-7, watched, laughed, and/or filmed the unprovoked attack.

66. McCann and others chased the young man around the truck as he tried to escape.

67. The young man was eventually able to get in his truck and leave, after which Minadeo, Dunn, Franks, and Does 1-7 celebrated and congratulated each other.

68. Dunn acknowledged that, if given the opportunity, the group would have done more harm to the young man. Dunn assured his fellow GDL members that he "was trying to grab him... I would've choked that motherfucker out."



*Image 3 – Video republished by WTVF Nashville showing McCann, Franks, and Dunn celebrating after attacking a young man of Jewish descent.*



*Image 4 – Video republished by WTVF Nashville showing McCann, Franks, and Dunn celebrating after attacking a young man and admitting deadly intent.*



*Image 5 – Video republished by WTVF Nashville showing GDL members McCann, Franks, Doe 1 celebrating after attacking the young man.*

69.    The incident was streamed and otherwise broadcast on GTV alongside vicious racist and antisemitic images and expressions, as was much of the harassment of the Nashville community by GDL and its members.

70.  McCann was indicted for assaulting the young man and is currently incarcerated awaiting trial.

## D.  GDL's July 14 Harassment and Intimidation of Young Black Children

71.  On July 14, 2024, the day after the parking lot attack, and in furtherance of their conspiracy to interfere with the rights of Black people, about twenty members of GDL took to the streets and sidewalks of Nashville. They gathered at or near the corner of Lower Broadway and 3rd Avenue North. They, along with other GDL members, marched through downtown Nashville. Most members wore GDL t-shirts that are sold on GTV that read "Whites Against Replacement."[5] Some members carried large swastika flags on metal or wooden poles.

72.  On July 14, 2025, four young Black boys, aged eight to eleven, who regularly play bucket drums to entertain people and to get tips, were downtown when they came in contact with about half a dozen GDL members, including Minadeo, Bysheim, Morris and Dunn.

73.   The grown men verbally harassed and intimidated the boys, using versions of the n-word (e.g., "n****rs," "n*glets," and "n*gglings") nearly a dozen times and referring to the children as monkeys, while filming themselves and the children.

74.  Police intervened and escorted the boys away from the mob while GDL members jeered, raised their arms in Heil Hitler salutes, and called them "faggots" and other slurs.

75.  Because of the encounter with GDL, the boys did not entertain tourists on that day and have been too scared to return downtown to drum since then.

## E.  GDL's Conspiracy Continued with Another Racially-Motivated Attack

---

[5] The "great replacement" theory is "a conspiracy theory that states that nonwhite individuals are being brought into the United States and other Western countries to 'replace' white voters to achieve a political agenda." *See, e.g.*, Dustin Jones, *What is the 'great replacement' and how is it tied to the Buffalo shooting suspect?,* NPR, (May 16, 2022, 12:35 AM), https://www.npr.org/2022/05/16/1099034094/what-is-the-great-replacement-theory.

76.   After assaulting and intimidating the Black children and broadcasting this hate-for-pay activity for commercial gain, the group of GDL members went in search of a spot without police.

77.   Other contingents of GDL members were also accosting passersby, marching through downtown chanting "*Sieg Heil*," "white fucking power," and "fuck the Jews" and performing the Nazi salute. Often, the formation, aggressiveness, and sheer number of GDL members forced pedestrians either off the sidewalk and into the street or to take alternative routes to avoid the provocation and harassment.

78.   As a contingent of upwards of a dozen or more GDL members marched past Johnny Cash's Bar and BBQ, Plaintiff was taking a break outside the bar during his work shift.

79.   As they passed Plaintiff, GDL members used antisemitic and racially charged language in a menacing manner. Bysheim directed an offensive utterance to Plaintiff.

80.   Plaintiff, who identifies as biracial and whose father is Black, walked up to Bysheim and asked what he had said. Bysheim called him a "n****r baby."

81.   The term used by Bysheim, and the manner and context in which he used it, are the definition of unprotected "fighting words," i.e., a "small class of expressive conduct that is likely to provoke the average person to retaliate"[6] and/or that "communicate an idea in a threatening manner."[7] The term conveys a message of racial hatred and bigotry and is generally regarded as uniquely taboo because of the legacy of racial hatred that underlies the history of its use by racist whites, and its continuing use as a viciously hostile epithet.

---

[6] *Knight Riders of Ku Klux Klan v. City of Cincinnati*, 72 F.3d 43, 46 (6th Cir. 1995) (citations omitted).

[7] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393 (1992) (explaining why fighting words are unprotected and listing examples of regulations banning fighting words that do not implicate First Amendment concerns).

82.  Courts across the country have recognized that, for example, "[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans" as the n-word[8]; the n-word "evok[es] a history of racial violence, brutality, and subordination"[9], and is so inflammatory that its use is "likely to provoke a violent reaction when addressed to an ordinary citizen of African–American descent."[10] Use of the n-word directed as it was here against a Black and biracial man is a powerful weapon and reflection of hatred and bigotry with capacity to incite, cause fear, and wound, and it did so in this case.

83.  The insult that Bysheim used was so aggressive that Plaintiff believed himself in threat of imminent harm and instinctively responded by striking Bysheim in order to get away. Plaintiff then immediately retreated.

84.  Minadeo, who was across the street inciting and filming, saw that Bysheim's assault and incitement had been successful and, with his arm still extended in a Nazi salute, rushed across the street while directing his members to "GET HIM!" referring to Plaintiff.

85.  Other GDL members, including Morris, and Does 8-10, followed Minadeo's command.

86.  Even though Plaintiff had immediately retreated, was not armed, and did not pose a threat to anyone, eight to ten GDL members and associates, rushed after him.

---

[8] *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring).

[9] *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).

[10] *In re John M.*, 36 P.3d 772, 776–77 (Ariz. Ct. App. 2001).



*Image 6 – GDL video showing Plaintiff retreating*

87. Plaintiff continued to retreat quickly on the sidewalk away from the group.

88. The pack of GDL members, including Minadeo, McCann, Bysheim, and Does 8-10, quickly surrounded Plaintiff and began attacking him, while Plaintiff attempted to defend himself.

89. Doe 8 attacked Plaintiff, slammed him into a parked vehicle, and attempted to punch and choke him.

90. Minadeo jumped on Plaintiff's back, put him in a chokehold, and attempted to gouge out his eyes.



*Image 7 – Minadeo gouging into Plaintiff's eye sockets*

91. While Minadeo choked and gouged Plaintiff's eyes, Bysheim kicked and punched Plaintiff and other members further assaulted him.



*Image 8 – Bysheim punches Plaintiff while Minadeo is on his back and GDL members, including Does 8-10, film and surround him*

92. McCann struck Plaintiff with the pole of his swastika flag in the face and the ribs while other GDL members, including Does 8-10, were holding, filming, and/or fighting Plaintiff.



*Image 9 – McCann strikes Plaintiff, who is being held by Minadeo, Doe 8, and others*

93.  Plaintiff was surrounded and terrified for his life. He eventually broke free, only by biting Minadeo and then pushing him off. Plaintiff again retreated and was chased into moving traffic.

94.  Officers with the Nashville Metropolitan Police Department eventually stopped the attack.

95.  In targeting a biracial man, provoking a fight, and viciously attacking Plaintiff while he was retreating, Minadeo, McCann, Bysheim, Morris, and Does 8-10 acted in alignment with their agreement to engage in racially motivated violence.

96.  As a result of the attack, Plaintiff lost sleep, suffered multiple contusions and experienced significant pain, suffering, anxiety and emotional distress, and avoided downtown Nashville out of fear for several months afterward.

**F.  GDL's Conspiracy Included Additional Religiously and Racially Motivated Harassment and Intimidation During Their Tour of Nashville.**

97.  Having spread antisemitic flyers downtown and having harassed young Black children and assaulted two people, GDL's Intimidation Tour of Nashville continued. On July 16, 2024, about a dozen members of GDL, including Minadeo, entered the Nashville Metropolitan Council meeting in t-shirts that read "Whites Against Replacement" or had other neo-Nazi imagery.

98.  Before entering the meeting, the members surrounded two Nashville residents who wore t-shirts reading "Nashville Against Nazis." GDL members, including Minadeo, began harassing, intimidating and provoking the citizens using sexist, racist, and misogynistic slurs, and calling the residents "race traitors." The citizens were frightened and intimidated.

99.  After stalking the residents up and down the hallways outside the chambers, GDL members followed them into the council chamber, surrounded them in a menacing manner, and continued their efforts to intimidate and harass them.

100. A rabbi who was signing up for public comment was similarly surrounded by GDL members and provoked with antisemitic slurs before a government official intervened to interrupt the targeted harassment.

101. During the meeting, as part of their provocation exercises, GDL members repeatedly displayed antisemitic gestures, interrupted the meeting by yelling racist and antisemitic insults and epithets, and harassed members of the media, individuals in the Metropolitan Council chamber, and council members.

102. The situation escalated when Minadeo began yelling slurs at council members.

103. Minadeo and GDL members became so disruptive that officers with the Metropolitan Nashville Police Department removed GDL members and cleared the gallery.

104. GDL members did not sign up to speak, did not engage with any policy or action under consideration, or otherwise participate in political discourse related to the scheduled meeting.

105. Throughout their tour of Nashville GDL members were witnessed engaging in activities in furtherance of their conspiracy on public property and in places of public accommodation, including:

- Throwing things at people who were perceived as Black, Jewish or their supporters;

- Directly provoking, intimidating and harassing people who were perceived as Black, Jewish or their supporters by yelling in their faces;

- Running up to people who were perceived as Black, Jewish or their supporters and pretending that they were going to hit them; and

- Threatening to engage in violence against people who were perceived as Black, Jewish or their supporters.

**G. GDL's Conspiracy to Target Jewish People with Harassment, Threats, and Intimidation Continued into January 2025**

106. TGDL's campaign of harassment and intimidation of the Nashville community did not end in July. After their Nashville activities, as set out in paragraphs 48-105, GDL continued to target Plaintiff, his family, and his employer online, as well as other members of the Nashville community, in furtherance of their conspiracy to harass and intimidate Jewish and Black people and their supporters.

107. Several months after their 10-day Intimidation Tour ended, GDL continued its conspiracy to harass and intimidate the Jewish community in Nashville by targeting places where Jewish people congregate. As with the activities taken as part of the NTNT, these activities were taken in furtherance of the conspiracy outlined herein and to advance GDL's mission and business purpose. Additional members of the Nashville community were intimidated and harmed.

<u>CAUSES OF ACTION</u>

COUNT ONE:

DEPRIVATION OF EQUAL PROTECTION UNDER THE KLAN ACT,
42 U.S.C. § 1985(3)

*Plaintiff v. All Defendants*

108. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

109. Defendants schemed, coordinated, and executed a common plan to target Nashville's Jewish and Black communities and to engage in harassment, intimidation, and racial violence against those communities beginning on or before July 12, 2024, when they arrived in Nashville to begin their "Name the Nose Tour" ("NTNT").

110. Defendants engaged in overt acts in furtherance of the conspiracy outlined herein, including, but not limited to, planning, coordinating, and traveling to Nashville for the NTNT where they engaged in various acts of harassment, intimidation and racial violence.

111. The activities described above were undertaken by Defendants, their agents, and co-conspirators as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive Black and Jewish individuals of their rights to the equal protection of the laws and their rights to the equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, including the right to be free from racial violence and the right to access places of public accommodation, because of their race or religion.

112. Defendants worked together and in tandem to engage in the conspiracy outlined herein.

113. All Defendants were motivated by and acted with animus based on race or ethnicity.

114. Plaintiff is a member of a protected class.

115. Plaintiff was targeted with the actions outlined in more detail above based on his membership in his racial or ethnic class.

116. GDL is vicariously liable for the violations of § 1985 by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL. At the time of the conspiracy alleged herein, GDL members Minadeo, McCann, Dunn, Franks, Morris and John Does 1-10 acted as GDL's agents within their roles as members and/or associates of the GDL.

117. Each of the actions taken in furtherance of the conspiracy described herein were reasonably foreseeable by each of the co-conspirators. It was reasonably foreseeable that the harm

described herein would occur as a result of GDL members' and associates' participation in GDL activities.

118. As a proximate cause of the conspiracy described herein, Plaintiff suffered injuries including physical injury, pain and suffering, and emotional distress.

## COUNT TWO:

### FAILURE TO PREVENT INTERFERENCE WITH CIVIL RIGHTS UNDER THE KU KLUX KLAN ACT OF 1871, 42 U.S.C. § 1986

*Plaintiff v. GDL, Jon Minadeo II, Ryan Scott McCann, Nicholas Alan Bysheim, Louie Dunn, Zane Fenton Morris, and John Does 1-10*

119. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

120. Each Defendant had actual knowledge that the wrongs conspired to be done, as set out in this Complaint, were about to be committed, and neglected or refused to prevent or aid in preventing those wrongs.

121. Each of the Defendants was in the position and had the power to prevent or aid in preventing the commission of the same.

122. As GDL's president or chief executive officer, Minadeo is the leader of GDL. He participated in meetings, messaging and/or the planning of the conspiracy outlined herein. He had knowledge of the conspiracy in violation of 42 U.S.C. § 1985(3) and had the power to prevent or aid in preventing the wrongs conspired to be done under Count 1. Minadeo had the power to stop the actions by GDL members, just as he had the power to direct them to "get" and attack Plaintiff but neglected to take such actions to prevent the conspiracy alleged herein, or to make other reasonably diligent efforts to prevent the conspiracy from occurring.

123. As a member and/or associate of GDL who helped plan the conspiracy alleged above, McCann, Bysheim, Dunn, Morris, and Does 1-10 had knowledge of the conspiracy in violation of

42 U.S.C. § 1985(3). They all participated in the Nashville NTNT, including in acts of racial violence during the tour. They each had the power to prevent or aid in preventing the wrongs conspired to be done under Count 1 but neglected to take such actions to prevent the conspiracy alleged herein or make other reasonably diligent efforts to prevent the conspiracy from occurring.

124. GDL is vicariously liable for the violations of § 1986 by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL. At the time of the conspiracy alleged herein, GDL members McCann, Bysheim, Dunn, Morris and Does 1-10 acted as the GDL's agents within their roles as members and/or associates of the GDL.

125. Plaintiff suffered damages, as outlined in Count 1, as a proximate cause of Defendants' neglect or refusal to prevent or aid in preventing the wrongful acts described above.

## COUNT THREE:

## BATTERY

### *Plaintiff v. GDL, McCann, Minadeo, Bysheim, and Doe 1*

126. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

127. On July 14, 2025, Defendants intentionally made physical contact with Plaintiff's body without his consent, as set out herein.

128. Minadeo pursued Plaintiff with the intent of causing him harm. Minadeo grabbed Plaintiff, jumped on him, punched him, placed him in a chokehold, shoved his fingers into Plaintiff's eye sockets and attempted to gouge out both of his eyes.

129. McCann pursued Plaintiff with violent intent and with the intent of causing him harm, punched him and physically struck him multiple times with a flagpole.

130. Bysheim pursued Plaintiff with the intent of causing him harm. Bysheim punched and kicked Plaintiff.

131. Doe 1 pursued, grabbed and punched Plaintiff with the intent of causing him harm.

132. GDL is vicariously liable for the battery by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL. At the time of the conspiracy alleged herein, GDL members Minadeo, McCann, Bysheim, and Doe 1 acted as the GDL's agents within their roles as members and/or associates of the GDL.

133. Each Defendant conspired with at least one or more other person to commit battery against Plaintiff. They agreed to and did engage in conduct to promote or facilitate the battery of Plaintiff and did so intentionally.

134. Plaintiff suffered injuries as a proximate cause of the battery described herein, including physical injury, pain and suffering, and emotional distress.

### COUNT FOUR:

### ASSAULT

### *Plaintiff v. GDL, McCann, Minadeo, Bysheim, Morris and Does 1-5*

135. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

136. All Defendants intentionally or knowingly caused Plaintiff to reasonably fear imminent bodily injury by, amongst other things, jointly chasing him, including chasing him into traffic, menacing him with flagpoles, and otherwise threatening him.

137. Defendants McCann, Minadeo, Bysheim, and Doe 1 intentionally, knowingly or recklessly caused Plaintiff bodily injury by punching, choking, kicking, and striking him with a flagpole.

138. All Defendants intentionally or knowingly caused physical contact with Plaintiff in such a way that a reasonable person would regard the contact as extremely offensive (e.g., by jointly pursuing him, jointly attacking him, attempting to gouge out his eyes, and striking him with a flagpole).

139. GDL is vicariously liable for the assault by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL. At the time of the conspiracy alleged herein, GDL members McCann, Minadeo, Bysheim, Morris, and Does 1-5 acted as the GDL's agents within their roles as members and/or associates of the GDL.

140. Each Defendant conspired with at least one or more other person to commit assault against Plaintiff. They agreed to and did engage in conduct to promote or facilitate the assault of Plaintiff and did so with intent, knowledge and/or recklessness.

141. As a proximate result of the actions described herein, Plaintiff suffered emotional distress and physical injury.

## COUNT FIVE:

## MALICIOUS HARASSMENT

### *Plaintiff v. GDL, Minadeo, McCann, Bysheim, Morris and Does 1-5*

142. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if fully set forth herein.

143. On July 14, 2024, members of GDL, including Bysheim, McCann and Does 1-10, marched past Plaintiff shouting racist slurs and making menacing and intimidating gestures at him and other people who were, or were perceived to be, Black.

144. Defendants used racist slurs and insults, attempting to intimidate or harass Plaintiff, preventing his ability to peacefully exist in front of his place of employment, in a parking lot, and on a public sidewalk.

145. Defendants chased Plaintiff into the traffic, punched and kicked him, jumped on him, attempted to gouge out his eyes, threatened him with flagpoles, and jammed a metal or wooden flagpole into his side and face while surrounding him with overwhelming force.

146. Defendants acted maliciously, i.e., with ill-will, hatred or spite, in chasing Plaintiff into traffic, viciously beating and attempting to beat him, ripping his shirt and causing bodily injury.

147. GDL is vicariously liable for the malicious harassment by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL. At the time of the conspiracy alleged herein, GDL members Minadeo, McCann, Bysheim, Morris, and Does 1-10 acted as the GDL's agents within their roles as members and/or associates of the GDL.

148. Each Defendant conspired with at least one or more other persons to maliciously harass Plaintiff. They agreed to and did engage in conduct to promote or facilitate the malicious harassment of Plaintiff and did so with ill-will, hatred or spite.

149. As a proximate result of the actions described above, Plaintiff was physically injured, his personal property was damaged and he was unlawfully intimidated from the free exercise or enjoyment of a constitutional right, including his right to be free from racial intimidation and violence and the badges of slavery as well as his right to the equal enjoyment of places of public accommodation.

## JURY DEMAND

150. In accordance with the Seventh Amendment of the U.S. Constitution, FED. R. CIV. P. 38(b) and (c), and LR 7.03(b), Plaintiff respectfully demands a jury trial on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Court grant the following relief:

151. A declaratory judgment that the actions described herein deprived Plaintiff of his rights under federal and state law;

152. Injunctive relief enjoining Defendants from future violations of rights guaranteed by state and federal law;

153. Nominal, compensatory, and punitive damages in an amount to be determined at trial;

154. An award of costs, including reasonable attorney's fees; and

155. Such other relief as the Court deems necessary and proper.

Respectfully submitted,

/s/ Benjamin K. Raybin
**RAYBIN & WEISSMAN, P.C.**
Benjamin K. Raybin (BPR #29350)
424 Church Street, Suite 2120
Nashville, Tennessee 37219
(615) 256-6666
(615) 254-4254- fax
BRaybin@NashvilleTNLaw.com

**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
Fax: (404) 377-0708

Scott D. McCoy
*pro hac vice pending*
Florida Bar No. 1004965

Elizabeth Littrell
*pro hac vice pending*

Georgia Bar No. 454949

Arusha Gordon
*pro hac vice pending*
D.C. Bar No. 1035129

Huey Fischer García
*pro hac vice pending*
Louisiana Bar No. 39571

**JOSEPH GREENWALD & LAAKE, PA**
6404 Ivy Ln., Ste. 400
Greenbelt, Maryland 20770

Erika Jacobsen White
*pro hac vice pending*
Maryland Bar No. 21815