IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DEAGO BUCK, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:25-cv-00677 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| GOYIM DEFENSE LEAGUE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Deago Buck ("Plaintiff") initiated this lawsuit by filing a complaint (Doc. No. 1, "Complaint") in this Court naming as defendants Goyim Defense League ("GDL" or "Defendant GDL"), Jon Minadeo II ("Defendant Minadeo"), Ryan Scott McCann ("Defendant McCann"), Nicholas Alan Bysheim ("Defendant Bysheim"), Louie Dunn ("Defendant Dunn"), Colby Alexander Franks ("Defendant Franks"), Zane Fenton Morris ("Defendant Morris"), and John Does 1-10.

Pending before the Court is a "Motion to Dismiss for Lack of Jurisdiction" (Doc. No. 22, "GDL Motion") filed by Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, and Defendant Morris, and a "Motion to Dismiss for Lack of Jurisdiction" (Doc. No. 28, "Dunn Motion," and, collectively with the GDL Motion, "Motions"), filed by Defendant Dunn and asserting the same grounds as the GDL Motion.[1] In support of the GDL Motion, Defendant

---

[1] The Court herein will refer to the defendants bringing the Motions (i.e., Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Morris and Defendant Dunn) collectively as "Defendant-Movants" and to all defendants, including John Does 1-10, collectively as "Defendants." Notably, Defendant Franks joined neither of the Motions before the Court and thus is not one of the Defendant-Movants. None of the John Does 1-10 have been identified or appeared in this action, and so none is among Defendant-Movants, either. When multiple ones of the John Does are referred to herein, the reference is to "Defendant Does _-_."

GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, and Defendant Morris filed a memorandum of law (Doc. No. 23, "Opening Brief"), which the Dunn Motion later purported to join.[2] (Doc. No. 28 at 1). Plaintiff has filed a response (Doc. No. 29, "Response") in opposition to the Motions. Defendant-Movants have filed a reply (Doc. No. 30, "Reply") in further support of the Motions, and Plaintiff has filed a sur-reply (Doc. No. 36, "Sur-Reply") in further opposition to the Motions.

Via the Motions, Defendant-Movants seek dismissal of Plaintiff's federal claims in the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and a corresponding dismissal of Plaintiff's state law claims pursuant to Fed. R. Civ. P. 12(b)(1) in the event that the federal claims are dismissed. (Doc. No. 22 at 1; Doc. No. 28 at 1). For the reasons stated herein, the Motions will be **DENIED.**

ALLEGED FACTS[3]

1. <u>The Parties</u>

Plaintiff Deago Buck is a resident of Tennessee. (Doc. No. 1 at ¶ 12). Plaintiff "identifies as biracial," and his father is Black. (*Id.* at ¶ 80).

Defendant GDL is an "unincorporated association of white supremacists whose mission includes declaring war on Jewish people with the goal of exterminating and/or expelling them from the United States and Europe, subjecting Jews and people of color to harassment, intimidation and

---

[2] The Court accepts that Dunn "joined onto" the Opening Brief so that the arguments therein will be applied by the Court to the Dunn Motion.

[3] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

violence for the purpose of creating 'white nations,' and enlisting recruits to aid in achieving these objectives." (*Id.* at ¶ 14). Plaintiff alleges that Defendant GDL "is also a 'hate-for-profit enterprise'" with a penchant for using "racism and antisemitism in combination with confrontation, provocation, harassment, intimidation and violence as tactics for monetary gain." (*Id.* at ¶ 15). Defendant GDL "engages in online commerce grounded in white nationalism and antisemitism" through "GoyimTV" ("GTV"), a video website "which livestreams and publishes GDL-created videos," through the "GoyimTV Shop," which is "promoted through GTV" and sells "white supremacist and antisemitic products," and through "GTV Flyers." (*Id.* at ¶¶ 15, 46). Defendant GDL and its members also "solicit 'donations'" via GTV "in support of their confrontations, harassment, intimidation, and violence against Jewish [people] and people of color and their supporters, and those viewed as not members of 'the White race.'" (*Id.* at ¶ 46).

Defendant GDL, through its members, has a history of "unleashing neo-Nazi havoc in communities by descending upon a city, engaging in menacing conduct designed to intimidate people based on race and/or religion[,]" and "chanting or otherwise directing insults at people who are, or are perceived to be LGBTQ, Jewish, and/or not members of 'the White race.'" (*Id.* at ¶ 40). These incidents are frequently conducted as "Intimidation Tours." (*Id.* at ¶¶ 40-45). One purpose of these so-called Intimidation Tours is to target people whom the GDL or its membership "believe to be Jewish or Black for harassment, intimidation, and to engage in violence against them, to further GDL's goal to 'exterminate' and/or 'expel' people who are Jewish or Black from the United States." (*Id.* at ¶ 41). A second purpose of these tours "is to generate content of the acts of harassment and intimidation that can then be shared and used to further harass and intimidate victims online as well as for GDL's commercial gain and recruitment." (*Id.* at ¶ 42).

Defendant Minadeo is "the co-founder, and a leader, director, managing agent, and/or a member of GDL," and "is, or acts in the capacity as, GDL's president and [CEO]." (*Id.* at ¶ 17). Defendant Minadeo "directs GDL and its members, organizes and leads Intimidation Tours, which he . . . calls 'Name the Nose Tours' . . . [and] publishes on, profits from, and helps run GTV and the Goyim[TV] Shop." (*Id.* at ¶ 29).[4]

Defendant McCann, Defendant Bysheim, Defendant Dunn, Defendant Franks, and Defendant Morris are each members or associates of the GDL. (*Id.* at ¶¶ 18-22). Likewise, Defendant Does 1-10 are also members or associates of the GDL, "whose identities are currently unknown." (*Id.* at ¶ 23).

2. Factual Background[5]

Plaintiff's claims are based on Defendants' "campaign to assault, harass and intimidate the Jewish and Black communities of Nashville[,]" Tennessee during an Intimidation Tour that Defendants undertook during July 2024. (Doc. No. 1 at ¶¶ 1-8, "Nashville Intimidation Tour"). Plaintiff alleges that Defendants have "violated the Ku Klux Klan Act of 1871" and that "Defendants engaged in assault, battery, malicious harassment, and conspiracy" during the Nashville Intimidation Tour. (*Id.* at ¶ 8).

The Nashville Intimidation Tour was the "sixth so-called 'Name the Nose Tour'" and "was attended by approximately twenty-five GDL members and/or associates." (*Id.* at ¶ 50). In the leadup to the Nashville Intimidation Tour, which is described in further detail below, "Defendants organized, directed and otherwise planned the Nashville Intimidation Tour, using GDL channels

---

[4] "Name the Nose Tour" is a "reference to an antisemitic trope regarding noses of Jewish people used by antisemitic individuals and groups." (Doc. No. 1 at 9 n.1).

[5] Although many of the allegations described in subsections 2(a), 2(b), 2(d), 2(e), and 2(f) of this Memorandum Opinion detail alleged injuries to parties not before the Court, the Court recites them here both for background and for context underlying Plaintiff's claims that Defendants engaged in a conspiracy.

of communication prior to their arrival in Nashville on or about July 12, 2024." (*Id.* at ¶ 48). During the tour, "GDL members stayed at a rental home in Kentucky and traveled to and from the home in a 15-person van . . . where they continued to plan and agree to their conspiracy" to "harass, threaten, intimidate, provoke, and engage in racially or religiously motivated violence in Nashville." (*Id.* at 13, ¶ 49) (cleaned up).

Plaintiff's Complaint is organized around a series of incidents during and after the Nashville Intimidation Tour that the Court will now recount in detail.

### a. July 13th, 2024 Attack

During the evening of July 13, 2024, "more than a dozen members [or associates] of GDL" including Defendant McCann, Defendant Dunn, Defendant Minadeo, Defendant Franks, and Defendant Does 1-7, gathered in or near a "parking lot at 905 Clark Place" ("Clark Place Lot") in Nashville, Tennessee. (*Id.* at ¶¶ 51-52). In the Clark Place Lot, the gathered GDL members or associates "encountered two young men" near a vehicle. (*Id.* at ¶¶ 53-54). One of these young men "was or appeared to be, white," ("friend") and the other was a "20-year-old-man of Jewish descent ("young man" or "young man of Jewish descent")." (*Id.* at ¶ 53). The gathered GDL members or associates "surrounded the young man of Jewish descent" and "began to antagonize, harass, intimidate, and attempt to provoke him into a confrontation." (*Id.* at ¶ 54). The young man of Jewish descent "was targeted based on his actual or perceived status as a Jewish person," (*id.* at ¶ 55), and was subject to numerous antisemitic comments. (*Id.* at ¶¶ 55-56). Defendant Minadeo, Defendant Dunn, Defendant Franks, and Defendant Does 1-7 "refused to back away from [the young man] and his vehicle," while continuing to "provoke and intimidate him." (*Id.* at ¶ 58). Defendant Minadeo also impeded the young man and his friend from leaving the Clark Place Lot. (*Id.* at ¶ 57). Throughout this encounter, the young man "maintained a calm demeanor" and

"remained unthreatening" even in the face of goading by Defendant Does 4-5 to touch Defendant McCann. (*Id.* at ¶¶ 60-61). Even though the young man remained calm, Defendant McCann "struck the young man," and subsequently Defendant Minadeo directed the gathered GDL Members or associates by saying, "[h]ere we go." (*Id.* at ¶¶ 62-63). Defendant Dunn subsequently "grabbed the young man and body-slammed him." (*Id.* at ¶ 65). The other gathered GDL members or associates "watched, laughed, and/or filmed the unprovoked attack." (*Id.*). Eventually the young man and his friend were able to escape. (*Id.* at ¶ 67).

The incident described above "was streamed and otherwise broadcast on GTV." (*Id.* at ¶ 69). At some point, Defendant McCann "was indicted for assaulting the young man and is currently incarcerated awaiting trial." (*Id.* at ¶ 70).

    *b. July 14th, 2024 Incident*

The next day, July 14, 2024, "about twenty members of GDL took to the streets and sidewalks of Nashville." (*Id.* at ¶ 71). "[F]our young Black boys, aged eight to eleven, who regularly play bucket drums to entertain people and to get tips," were in downtown Nashville "when they came in contact with about half a dozen GDL members," including "[Defendant] Minadeo, [Defendant] Bysheim, [Defendant] Morris and [Defendant] Dunn." (*Id.* at ¶ 72). These GDL members "harassed and intimidated the boys," using a version of the n-word "nearly a dozen times and referring to the children as monkeys, while filming themselves and the children." (*Id.* at ¶ 73). Police were forced to intervene "and escorted the boys away from the [GDL] mob." (*Id.* at ¶ 74).

    *c. July 14th, 2024 Assault on Plaintiff*

Later the same day, a "contingent of upwards of a dozen or more GDL members [or associates] marched past Johnny Cash's Bar and BBQ" while "Plaintiff was taking a break outside

the bar during his work shift." (*Id.* at ¶ 78). Passing by Plaintiff, "GDL members used antisemitic and racially charged language in a menacing manner" and Defendant "Bysheim directed an offensive utterance to Plaintiff." (*Id.* at ¶ 79). Plaintiff approached Defendant Bysheim "and asked what" Defendant Bysheim "had said." (*Id.* at ¶ 80). Defendant Bysheim stated that he had called Plaintiff a "n****r baby." (*Id.*).

Defendant Bysheim's insult was "so aggressive that Plaintiff believed himself in threat of imminent harm" and struck Defendant Bysheim "in order to get away." (*Id.* at ¶ 83). Upon witnessing this altercation, Defendant Minadeo "saw that [Defendant] Bysheim's . . . incitement had been successful and, with his arm still extended in a Nazi salute, rushed across the street while directing [the GDL] members to 'GET HIM!' referring to Plaintiff." (*Id.* at ¶ 84). "Other GDL members [or associates]," including Defendant Morris and Defendant Does 8-10 "followed [Defendant] Minadeo's command" and "rushed after [Plaintiff]." (*Id.* at ¶¶ 85-86). While Plaintiff retreated "on the sidewalk" and "away from the group," the group of GDL Members or associates (including Defendant Minadeo, Defendant McCann, Defendant Bysheim and Defendant Does 8-10) "quickly surrounded Plaintiff and began attacking him, while Plaintiff attempted to defend himself." (*Id.* at ¶¶ 87-88). Plaintiff "eventually broke free," and while retreating "was chased into moving traffic" (i.e., was chased from the sidewalk into the road). (*Id.* at ¶ 93). Eventually members of the Metropolitan Nashville Police Department stopped the assault. (*Id.* at ¶ 94). "In targeting" Plaintiff "while he was retreating," Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Morris, and Defendant Does 8-10 "acted in alignment with their agreement to engage in racially motivated violence." (*Id.* at ¶ 95).

*d. July 16, 2024 Incident*

The Nashville Intimidation Tour continued apace. On July 16, 2024 "a dozen members of GDL, including [Defendant] Minadeo, entered the Nashville Metropolitan Council meeting in t-shirts that read 'Whites Against Replacement' or had other neo-Nazi imagery." (*Id.* at ¶ 97). Prior to entering the meeting, "GDL members, including Defendant [Minadeo]" harassed, intimidated and provoked Nashville residents by "using sexist, racist, and misogynistic slurs, and calling [Nashville] residents 'race traitors.'" (*Id.* at ¶ 98). GDL members then followed the residents "into the council chamber, surrounded [the residents] in a menacing manner, and continued . . . to intimidate and harass them." (*Id.* at ¶ 99). GDL members also "surrounded" a "rabbi who was signing up for public comment" at the meeting, and "provoked" him "with antisemitic slurs." (*Id.* at ¶ 100). Further, "GDL members repeatedly displayed antisemitic gestures, interrupted the meeting by yelling racist and antisemitic insults and epithets, and harassed members of the media, individuals in the Metropolitan Council chamber, and council members." (*Id.* at ¶ 101). Ultimately Defendant Minadeo and the other GDL members present were removed from the meeting by members of the Metropolitan Nashville Police Department. (*Id.* at ¶ 103).

*e. Summing Up the Nashville Intimidation Tour*

In sum, throughout the Nashville Intimidation Tour, "GDL members were witnessed engaging in activities in furtherance of their conspiracy on public property and in places of public accommodation," (*id.* at ¶ 105), including:

- "Throwing things at people who were perceived as Black, Jewish or their supporters." (*Id.*)

- "Directly provoking, intimidating and harassing people who were perceived as Black, Jewish or their supporters by yelling in their faces." (*Id.*)

- "Running up to people who were perceived as Black, Jewish or their supporters and pretending that they were going to hit them." (*Id.*)

- "Threatening to engage in violence against people who were perceived as Black, Jewish or their supporters." (*Id.*)

*f. Events After the Nashville Intimidation Tour*

Following the conclusion of the Nashville Intimidation Tour, Defendant GDL's "campaign of harassment and intimidation of the Nashville community did not end." (*Id.* at ¶ 106). Instead, "GDL continued its conspiracy to harass and intimidate the Jewish community in Nashville by targeting places where Jewish people congregate." (*Id.* at ¶ 107). "As with the activities" undertaken as part of the Nashville Intimidation Tour, "these activities were taken in furtherance of the conspiracy [detailed above] and to advance GDL's mission and business purpose." (*Id.*).

Moreover, "GDL continued to target Plaintiff, his family, and his employer online, as well as other members of the Nashville community, in furtherance of their conspiracy to harass and intimidate Jewish and Black people and their supporters." (*Id.* at ¶ 106). Specifically, "Plaintiff, his family, his employer, and . . . others seen as sympathetic to multiculturalism" received "death threats by GDL members." (*Id.* at ¶ 7). Indeed, after and "[a]s a result of the attack[,] Plaintiff . . . avoided downtown Nashville out of fear for several months." (*Id.* at ¶ 96).

<u>PLAINTIFF'S CLAIMS AND DEFENDANT-MOVANTS' MOTIONS</u>

Based on the forgoing, Plaintiff brings five claims.

Count One is a claim against all Defendants pursuant to 42 U.S.C. § 1985(3) (hereinafter, sometimes, "Section 1985(3)"). (Doc. No. 1 at ¶¶ 108-18). More specifically, in Count One, Plaintiff alleges a conspiracy to deprive Plaintiff of his rights under the Thirteenth Amendment to

"be free from racial violence" and to "access places of public accommodation," because of Plaintiff's "race or religion." (*Id.* at ¶ 111).[6]

In Count One, Plaintiff alleges that Defendants "schemed, coordinated, and executed a common plan to target Nashville's Jewish and Black communities and to engage in harassment, intimidation, and racial violence against those communities beginning on or before July 12, 2024" when Defendants began their Nashville Intimidation Tour. (*Id.* at ¶ 109). More specifically, Plaintiff alleges that (1) "Defendants engaged in overt acts in furtherance of the conspiracy"; (2) that Defendants' activities were undertaken "as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive Black and Jewish individuals of their rights to the equal protection of the laws and their rights to the equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, including the right to be free from racial violence and the right to access places of public accommodation, because of their race or religion"; (3) that "Defendants worked together and in tandem to engage in the [above described] conspiracy"; (4) that "Defendants were motivated by and acted with animus based on race or ethnicity"; and (5) that Plaintiff was targeted (as detailed above) "based on his membership in his racial or ethnic class." (*Id.* at ¶¶ at 110-13, 115). In Count One, Plaintiff also alleges that "GDL is vicariously liable for the violations of § 1985 by its agents

---

[6] In his Complaint, Plaintiff does not explicitly root the right to be free from racial violence and the right to access places of accommodation in the Thirteenth Amendment. Nevertheless, based on the context of the parties' briefing on the Motions, the Court understands Plaintiff to be bringing his federal claims as predicated on these rights as rooted in the Thirteenth Amendment, and thus as enforceable against private, non-state parties, like Defendants. (Doc. No. 29 at 9-15, Doc. 30 at 1-4) (discussing the right to be free from racial violence, and the right to equal access of public accommodations in the context of the Thirteenth Amendment). *See also Volunteer Med. Clinic v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir 1991) (recognizing that "rights guaranteed by the Thirteenth Amendment" are "'assertable against private . . . interference.'" (quoting *Giffin v. Breckenridge*, 403 U.S. 88, 105 (1971))). The Court's understanding of the bases of the rights at issue here is supported by Plaintiff's allegations, which do not contain any mention of state involvement or state action interfering with Plaintiff's rights.

and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL." (*Id.* at ¶ 116).

Count Two is a claim against Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Dunn, Defendant Morris, and Defendant Does 1-10 pursuant to 42 U.S.C. § 1986 (hereinafter, sometimes, "Section 1986"). (*Id.* at 28, ¶¶ 119-125). Specifically, in Count Two Plaintiff alleges that Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Dunn, Defendant Morris, and Defendant Does 1-10 failed to prevent the conspiracy to deprive Plaintiff of his Thirteenth Amendment rights as detailed in Count One. (*Id.* at ¶ 120).

In Count Two Plaintiff alleges more particularly (1) that each "Defendant [named in Count Two] had actual knowledge that the wrongs conspired to be done, as set out in [the] Complaint, were about to be committed, and neglected or refused to prevent or aid in preventing those wrongs"; (2) that "[e]ach of the Defendants [named in Count Two] was in the position and had the power to prevent or aid in preventing the commission of the same"; (3) that as GDL's president and CEO, Defendant "Minadeo is the leader of GDL" and "had the power to stop the actions by GDL members . . . but neglected to take such actions to prevent the conspiracy alleged herein, or to make other reasonably diligent efforts to prevent the conspiracy from occurring"; and (4) that "[Defendant] McCann, "[Defendant] Bysheim, "[Defendant] Dunn, "[Defendant] Morris, and "[Defendant] Does 1-10 had knowledge of the conspiracy in violation of 42 U.S.C. § 1985(3) . . .[,] participated in the Nashville [Intimidation Tour], including in acts of racial violence during the tour" and "had the power to prevent or aid in preventing the wrongs conspired to be done under Count [One] but neglected to take such actions to prevent the conspiracy alleged herein or make other reasonably diligent efforts to prevent the conspiracy from occurring." (*Id.* at ¶¶ 120-123).

Plaintiff also alleges that Defendant "GDL is vicariously liable for the violations of § 1986 by its agents and/or associates, each of whom acted within the scope of their agency, within furtherance of GDL's business and at the command, direction or authorization of GDL." (*Id.* at ¶ 124).

In Counts Three, Four, and Five, Plaintiff alleges state law claims for, respectively, battery (against Defendant GDL, Defendant McCann, Defendant Minadeo, Defendant Bysheim, and Defendant Doe 1) (*id.* at ¶¶ 126-34), assault (against Defendant GDL, Defendant McCann, Defendant Minadeo, Defendant Bysheim, Defendant Morris, and Defendant Does 1-5) (*id.* at ¶¶ 135-41), and malicious harassment (against Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Morris and Defendant Does 1-5). (*Id.* at ¶¶ 142-49). Notably, with respect to these claims, Plaintiff asserts not that this Court has original subject-matter jurisdiction under 28 U.S.C. § 1332 by virtue of diversity of citizenship of the two sides, but rather that this Court has *supplemental jurisdiction* under 28 U.S.C. §1367 by virtue of them being so closely related to the federal claims as to form part of the same case or controversy. (*Id.* at ¶ 9).

Plaintiff seeks a declaratory judgment that Defendants' actions "deprived Plaintiff of his rights under federal and state law," and an order enjoining Defendants "from future violations of rights guaranteed by state and federal law." (*Id.* at ¶¶ 151-52). Plaintiff also seeks "[n]ominal, compensatory, and punitive damages" and an "award of costs." (*Id.* at ¶¶ 153-54).

Faced with these allegations, Defendant-Movants argue in their Opening Brief that Counts One and Two (which set forth Plaintiff's two federal claims) are subject to dismissal under Rule 12(b)(6) for failure to state a claim. In support of that argument, Defendant-Movants argue that "[a]lthough the statutes 42 U.S.C. §§ 1985 and 1986, do allow for a tort claim even without any color of law, they at least require some distortion of the law's 'equal protection'" and that Plaintiff

has failed to allege that Defendants "conspired with the government, or otherwise conspired to violate any federal rights governing private behavior." (Doc. No. 23 at 4-5). More particularly, Defendant-Movants argue that Plaintiff fails to state a claim because although "the Complaint does squarely say that the Defendants conspired to violate 'the right to be free from racial violence,' as well as 'the right to access places of public accommodation,'" those rights (according to Defendant-Movants) "are not federal constitutional rights." (Doc. No. 23 at 5-6).

Defendant-Movants then argue that if Plaintiff fails to state a claim as to his federal claims, then the Court "lacks" (i.e., is "deprive[d of]") subject-matter jurisdiction over Plaintiff's state-law claims in Counts Three, Four, and Five, by which Defendant-Movants clearly mean that the Court should *decline to exercise supplemental jurisdiction* over Plaintiff's state law claims.[7] (Doc. No. 23 at 2, 9-10). As Defendant-Movants in their Opening Brief seem to concede, (Doc. No. 23 at 10), if the Court finds that Plaintiff has stated a claim as to one or more of his federal claims in Counts One or Two, Defendant-Movants' jurisdiction-based argument for dismissal of the state-law claims necessarily fails.

## LEGAL STANDARD

As an initial matter, the Court notes that the Opening Brief puts forward arguments under both Rule 12(b)(6) for failure to state a claim and under Rule 12(b)(1) for lack of subject matter jurisdiction. As discussed below, the Court ultimately concludes that Plaintiff has stated a claim

---

[7] It is one thing for a court to find that it lacks (or is "deprived of") jurisdiction, and it is another thing for a court to *have* jurisdiction but *decline* in its discretion *to exercise* such jurisdiction. Defendant-Movants clearly are aware of this distinction and—despite their unfortunate use of language suggesting that the Court should do the former—plainly are asserting only that the Court should do the latter. (Doc. No. 23 at 9-10) (noting that "where the federal claims are dismissed and only state claims remain, the court may decline to exercise jurisdiction" and that "where the federal claims are dismissed either early on, or else on the grounds of failure to state a claim, then the general rule is that the court shouldn't exercise any supplemental jurisdiction.").

as to his federal claims in Counts One and Two, such that Defendant-Movants' argument that the Court lacks subject-matter jurisdiction over Plaintiff's state-law claims—which is actually an argument that the Court should decline to exercise supplemental jurisdiction over the state-law claims if and when the federal claims are dismissed—never gets off the ground. Therefore, the Court will explain only the standard for a motion to dismiss under Rule 12(b)(6) and not Rule 12(b)(1).[8]

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, or are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy

---

[8] There is another reason why Rule 12(b)(1) is (at least arguably) not implicated on the instant Motions. Rule 12(b)(1) contemplates dismissal for *lack* of subject-matter jurisdiction. But as discussed, Defendant Movants' argument for dismissal asserts not a *lack* of jurisdiction, but rather the propriety of *declining to exercise* subject-matter jurisdiction (i.e., supplemental jurisdiction under 28 U.S.C. §1367) if and when all federal claims are dismissed.

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

DISCUSSION

1. <u>Count One: Section 1985(3)</u>

Via Count One, Plaintiff brings a claim under Section 1985(3) and alleges a conspiracy to deprive Plaintiff of his rights under the Thirteenth Amendment to "be free from racial violence" and to "access places of public accommodation," because of Plaintiff's "race or religion." (Doc. No. 1 at ¶¶ 108-18).

Below, the Court will first discuss the Thirteenth Amendment and Section 1985(3) generally, then address the parties' arguments specifically with respect to Count One of the Complaint.

a. *The Thirteenth Amendment and Section 1985(3)*[9] *Generally*

The Thirteenth Amendment provides:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

U.S. Const. amend. XIII.

"By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). To keep that pledge, "Congress has the power" through the Thirteenth Amendment's enabling clause in Section 2 "rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). And the Supreme Court has further

---

[9] This subsection of Section 1985 provides in full:

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

28 U.S.C. § 1985(3)

concluded that, "Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action [in Section 1985] for Negro citizens who have been victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men." *Griffin*, 403 U.S. at 105.

"Congress enacted § 1985 to address the racial violence perpetrated by groups like the Ku Klux Klan after the Civil War and during Reconstruction." *Rives v. University of Tennessee*, No. 24-5336, 2024 WL 5103829, at *5 (6th Cir. Dec. 13, 2024) (citing *Post v. Trinity Health-Michigan*, 44 F.4th 572, 579 (6th Cir. 2022)). President Grant signed Section 1985 "into law to end the terror that the Ku Klux Klan had been inflicting on African Americans and their supporters during the Reconstruction period." *Post*, 44 F.4th at 579 (citing *United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 835–37 (1983)). Section 1985(3) provides "a cause of action for damages caused by purely private conspiracies." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). However, "whether a private conspiracy falls within the scope of the statute depends entirely upon the nature of the right asserted." *Prieto v. Kalamazoo Metal Recyclers, Inc.*, No. 1:08-CV-706, 2008 WL 5087968, at *6 (W.D. Mich. Nov. 26, 2008). That is to say, "if the right" predicating the Section 1985(3) claim "exists as against all actors, private as well as state, then no showing of state action is required." *Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.3d 218, 226 (6th Cir. 1991). Importantly, "Section 1985(3), provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Novotny*, 442 U.S. at 372.

In order to state a claim for conspiracy under the statute, a plaintiff must allege the following elements "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or

immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003) (quoting *Scott*, 463 U.S. at 828-29). In addition to the above, a Section 1985(3) claim must also contain allegations of "class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102. More particularly with respect to this requirement, the Sixth Circuit has held that "§ 1985(3) applies only to conspiracies targeting individuals based on classifications—like race or religion—that receive heightened scrutiny under the Equal Protection Clause." *Rives*, 2024 WL at *5 (citing *Post*, 44 F.4th at 580). Thus, a plaintiff bringing a Section 1985(3) claim in effect also must satisfy a fifth element, i.e., that "the conspiracy was motivated by racial, or another class-based animus." *Kuerbitz v. Meisner*, No. 17-2284, 2018 WL 5310762, at *3 (6th Cir. July 11, 2018) (quoting *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996)) (internal quotation marks omitted).

      *b. Plaintiff Has Stated a Section 1985(3) Claim.*[10]

---

[10] Defendant-Movants argue that a Section 1985(3) claim requires some sort of "distortion of the law's 'equal protection,'" (Doc. No. 23 at 4) and that to sustain a Section 1985(3) claim Defendants need to have either "sought to influence" the "application of state law" or otherwise distorted the "application of any federal rights." (*Id.* at 5). The Court rejects this argument (and also notes that is unclear exactly what Defendant-Movants mean when referring to the "distortion of the law's equal protection"). Defendant-Movants' framing on this point is at odds with the caselaw discussed above and below. Section 1985(3) claims do not require a distortion of the law's equal protection (whatever that means) or an attempt to "influence" the application of state law or distort the application of federal rights. Rather, Section 1985(3) claims require only that Plaintiff establish a conspiracy with the *purpose* of "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws" and that Plaintiff plead "an act in furtherance of the conspiracy" "whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian*, 335 F.3d at 518. No such distortion of the law's equal protection, or an attempt to influence the *application* of state law or distort the *application* of federal rights as claimed by Defendant-Movants is necessary (and, indeed, as private actors, it seems more likely to say that Defendants are not able to distort the law or influence its application anyway). Rather, as the Court discusses at length below, the decisive question in the present case is the extent to which Plaintiff may claim *under the Thirteenth Amendment* the right to be free from racial violence and the right to access public accommodations.

  On the other hand, Defendant-Movants, in arguing that Plaintiff need to have pled "some sort of distortion of the law's 'equal protection,'" may really be arguing that Plaintiff need to have alleged either that

Here, the Court understands Defendant-Movants to argue that Plaintiff has failed to plead the second and fourth elements of a Section 1985(3) claim, namely (according to Defendant-Movants) that Plaintiff has failed to plead that the conspiracy at issue here had the "purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws" and that Plaintiff has failed to plead an "injur[y] in his person or property or depriv[ation] of any right or privilege of a citizen of the United States." *Vakilian*, 335 F.3d at 518.[11] Specifically, Defendant-Movants argue that although "the Complaint does squarely say that the Defendants conspired to violate 'the right to be free from racial violence,'" and "'the right to access places of public accommodation,'" these "are not federal constitutional rights." (Doc. No. 23 at 5-6). Plaintiff counters that the "right to be free from

_____

Defendants "conspired with the government" (i.e., conspired with "the government" to deprive Plaintiff of rights that exist against *only* the government) to establish a Section 1985(3) claim, "or otherwise conspired to violate any federal rights governing private behavior," (i.e., conspired to violate rights that exist against private actors as well as the government), to establish a Section 1985(3) claim (Doc. No. 23 at 4-5). If this is the case, then the Court does not take issue with the broad thrust of this argument. However, as explained in further detail herein, this argument is still unavailing for Defendant-Movants because the Court ultimately concludes that Plaintiff has a right to be free from racial violence and a right to equal use and access to public amenities and places of public accommodations rooted in the Thirteenth Amendment (and thus enforceable against private actors), and those rights may be used to predicate a Section 1985(3) claim.

Related to the above, Defendant-Movants also argue that the Complaint must be dismissed because it does not allege that Defendants "sought to influence state action to violate of [sic] federal right." (Doc. No. 23 at 1). The Court rejects this argument. It is true that Plaintiff does not plead that Defendants "sought to influence any application of state law." (*Id.* at 5). But as suggested above, such a pleading is not necessary where the plaintiff brings a Section 1985(3) claim predicated on rights that "exist against all actors, private as well as state." *Volunteer Med. Clinic v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991). Here, because Plaintiff brings his Section 1985(3) claim predicated on rights, that is, a right under the Thirteenth Amendment to be free from racial violence and a right under the Thirteenth Amendment to access public accommodations, that exist against "all actors, private as well as state," no showing of state action is required. *Id.*

[11] Plaintiff asserts that Defendant-Movants argue that the fourth element of a Section 1985(3) claim alone has not been met, (Doc. No 29 at 7), and Defendant-Movants do not seem to contest this interpretation of their argument. However, the Court understands Defendant-Movants' argument here—that the allegedly violated rights are not rights at all—to be targeted actually at both the second *and* the fourth elements of a Section 1985(3) claim because just as Defendants could not deprive Plaintiff of a right or privilege that does not exist, Defendants likewise could not *intend* to deprive Plaintiff of a right or privilege that does not exist.

racially-motivated violence is a constitutional right, protected against state and private interference, and is rooted in the Thirteenth Amendment," (Doc. No. 29 at 12-14), and that the denial of the "right to equal use and access to public amenities and places of public accommodations" can also "serve as a predicate right [rooted in the Thirteenth Amendment] for a private conspiracy claim under [Section] 1985(3)." (Doc. No. 29 at 14-15).

Thus the question before the Court is whether there is a "right to be free from racially-motivated violence," (Doc. No. 29 at 12), or a "right to equal use and access to public amenities and places of public accommodation," (Doc. No. 29 at 14), rooted in the Thirteenth Amendment, and whether these rights may be used to support a Section 1985(3) claim.[12]

As explained above, Section 1985(3), provides no substantive rights itself, *Novotny*, 442 U.S. at 372, and because Section 1985(3) is purely remedial, the "rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere." *Scott*, 463 U.S. at 833. The Supreme Court has recognized that Section 1985(3) "constitutionally can and does protect [Thirteenth Amendment] rights from interference by purely *private* conspiracies." *Scott*, 463 U.S. 832-33 (emphasis added). *See also Wells v. Rhodes*, 928 F. Supp. 2d 920, 930 (S.D. Ohio 2013) ("the Supreme Court has recognized [the Thirteenth Amendment] as a source of rights for [Section] 1985(3)."). Those rights rooted in the Thirteenth Amendment may be asserted via Section 1985

---

[12] As discussed briefly in a footnote above, it is vital for Plaintiff to ground these rights *in the Thirteenth Amendment in particular* because the Thirteenth Amendment provides rights "assertable against *private* as well as governmental interference." *Volunteer Med. Clinic*, 948 F.2d at 226 (emphasis added) (quoting *Griffin*, 403 U.S. at 105). Other rights, for example those based in the "First and Fourteenth Amendments" are "by definition . . . right[s] only against state interference." *Id.* (internal quotation marks omitted) (internal citations omitted). To sustain a Section 1985(3) claim based on violations of rights that exist only against the state, plaintiff must "prove that the state was somehow involved in or affected by the conspiracy." *Id.* In his Complaint, Plaintiff alleges no state involvement, such that the right to be free from racial violence and the right to equal access to public accommodations underlying Plaintiff's Section 1985(3) claim must allegedly have been violated by private interference (and thus rooted in the Thirteenth Amendment) if his claim is to survive.

against "private as well as governmental interference." *Volunteer Med. Clinic*, 948 F.3d at 226 (quoting *Griffin*, 403 U.S. at 105). However, the Supreme Court has also explained in dicta that "few such rights" can support a Section 1985(3) claim. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993) (rejecting the notion that the "right to an abortion" was among those rights that may be vindicated by Section 1985(3) because it was a right not protected against "private infringement"). The Supreme Court has further noted that it has "hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude, and, in the same Thirteenth Amendment context, the right of interstate travel" as rights that may be the basis for a Section 1985(3) claim against private conspiracies. *Id.* (internal citations omitted).

Therefore, as explained above, and with these parameters in mind, the Court must look to see whether there is a "right to be free from racially-motivated violence," (Doc. No. 29 at 12), or a "right to equal use and access to public amenities and places of public accommodation," (Doc. No. 29 at 14), grounded in the Thirteenth Amendment and whether, if these rights exist, these rights may be used as a predicate for a Section 1985(3) claim.

### i. Thirteenth Amendment Right to Be Free from Racial Violence

The Supreme Court has yet to rule on whether there is a Thirteenth Amendment right to be free from racial violence that may be used as a predicate for a Section 1985(3) claim, and as noted above has "hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude, and, in the same Thirteenth Amendment context, the right of interstate travel," *Bray*, 506 U.S. at 278 (internal citations omitted), as rights that may predicate a Section 1985(3) claim against private conspiracies. Thus, the Court assesses Supreme Court dicta that speaks to the first issue, because "Supreme Court dicta is persuasive and cannot be ignored by lower courts for no good reason." *Cunningham v. Shoop*, 23 F.4th 636, 659 n.7 (6th Cir. 2022). And as discussed

below, Supreme Court dicta suggests that there is a broad range of Thirteenth Amendment rights that may be vindicated via Section 1985(3). Moreover, in light of this dicta, several lower courts have found a right to be free from racial violence to exist (and to be rooted in the Thirteenth Amendment) and that such a right may be used to support a Section 1985(3) claim.

The Court turns first to Supreme Court dicta. The Supreme Court addressed Section 1985(3) claims and the scope of the rights that may be vindicated under the statute first in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), and then in *Scott*, 463 U.S. 825. In *Griffin*, the Supreme Court concluded that Section 1985(3) claims were properly brought against white members of a private conspiracy who, after mistaking African Americans for civil rights workers, allegedly stopped the African Americans on a public highway and beat them. *Griffin*, 403 U.S at 89-92. In *Griffin*, the Court found the conspiracy actionable as violating the right to interstate travel, a right that the Supreme Court noted its previous cases had "firmly established" as "constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private as well as governmental interference." *Id.* at 104-07. In coming to this decision, the *Griffin* Court also explained that "the varieties of conduct," that Congress may make "civilly remediable" under the Thirteenth Amendment, "extend far beyond the actual imposition of slavery or involuntary servitude." *Id.* at 105. *Griffin* did not explicitly recognize that the right to interstate travel is rooted in the Thirteenth Amendment (or indeed, identify explicitly where that right is rooted). However, in *Scott*, the Supreme Court explained that the conspiracy in *Griffin* was actionable under Section 1985(3) "because it was aimed at depriving the plaintiffs of the *rights protected by the Thirteenth Amendment*" and "Section 1985(3) constitutionally can and does protect those [Thirteenth Amendment] rights from interference by purely private conspiracies," thereby implying in dicta that the right to interstate travel is protected by the Thirteenth Amendment in particular. *Scott*, 463

U.S. at 832–33 (emphasis added). *See also Bray*, 506 U.S. at 278 (noting that the Supreme Court has recognized in a "Thirteenth Amendment context, the right of interstate travel"). Together, *Griffin* and *Scott* suggest that Section 1985(3) protects rights beyond a narrow textual right to be free from involuntary servitude as enshrined in the Thirteenth Amendment. This must be so, because "the alleged assaults" in *Griffin* interfering with a right to interstate travel, although "certainly motivated by racial animus . . . could not be fairly described as seeking to literally enslave plaintiffs." *Sines v. Kessler*, 324 F. Supp. 3d 765, 781 (W.D. Va. 2018). In other words, there would seem to be a huge difference between (i) slavery or involuntary servitude; and (ii) interference with the ability to travel interstate. Indeed, that difference seems to be even greater than the difference between slavery (which in this country, of course, was race-based and enforced in part by what can only be called violence) and race-based violence. So, since the Supreme Court found that the Thirteenth Amendment encompasses a right to avoid interference with the ability to travel interstate (despite its divergence from a right to avoid slavery or involuntary servitude), the Court struggles to understand why the Thirteenth Amendment does not encompass a right to avoid racial violence.[13] That is to say, although *Griffin* and *Scott* do not explicitly recognize a right to be free from racial violence, these decisions suggest a broad panoply of rights protected under the Thirteenth Amendment and, as shown by a review of lower court decisions below, do not preclude such a right to be free from racial violence from being found by the lower courts in the Thirteenth Amendment.

The Court next turns to lower courts' decisions. Several district courts, in addressing the scope of those rights protected by the Thirteenth Amendment and whether those rights can be

---

[13] To be clear, the Court's views on this point do not stem from the undersigned's personal policy preferences, which are irrelevant here. Instead, the Court's views stem from a logical and dispassionate application of *Griffin*.

vindicated through Section 1985(3), have concluded that there is a right to be free from racial violence found in the Thirteenth Amendment and that such right may be vindicated via a Section 1985(3) claim.

Recently, in *Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018), a district court evaluating a Section 1985(3) claim concluded that the "Thirteenth Amendment provides [p]laintiffs an underlying right to be free from racial violence" and that such right may be vindicated through a Section 1985(3) claim. *Id.* at 782. In coming to this conclusion, the district court considered whether "the Thirteenth Amendment provides rights independent of Congressional action that go beyond a more narrow reading of the 'right to be free from involuntary servitude.'" *Id.* at 782. The district court, relying in part on *Griffin* and *Scott*, reasoned that "if Section 1985(3) protects Thirteenth Amendment rights that were implicated by the facts of *Griffin*," then Thirteenth Amendment rights protected by Section 1985(3) "must extend beyond the core 'right to be free from involuntary servitude'" expressly pronounced in the Thirteenth Amendment. *Id.* at 781. Accordingly, the district court found that plaintiffs had "an underlying right to be free from racial violence" that could be vindicated via Section 1985(3). *Id.* at 782.

Other district courts have held likewise, concluding that Section 1985(3) can be used to vindicate the Thirteenth Amendment rights of individuals to be free from racial violence. For example, one district court concluded that *Griffin* had held "that the Thirteenth Amendment allowed Congress through Section 1985 to protect Blacks from conspiracies to commit racial violence." *Red Elk v. Vig*, 571 F. Supp. 422, 425 n.4 (D.S.D. 1983). More recently, a district court found that Section 1985(3) could be used to reach a "conspir[acy] to commit violence . . . because of [a plaintiff's] race." *Frazier v. Cooke*, No. 4:17-CV-54, 2017 WL 5560864, at *2 (E.D. Va. Nov. 17, 2017).

To be sure, some courts have found that Section 1985(3) cannot be used to vindicate a right to be "free from intimidation and assault motivated by race and/or association with minorities." *Hogan v. County of Lewis, N.Y.*, No. 7:11-CV-0754 LEK/ATB, 2015 WL 1400496, at *12 (N.D.N.Y. Mar. 26, 2015), *aff'd sub nom. Okudinani v. Rose*, 779 F. App'x 768 (2d Cir. 2019). *See also Emanuel v. Barry,* 724 F. Supp. 1096, 1102-03 (E.D.N.Y.1989) (finding that for Jewish plaintiffs who were "ambushed" "asleep in their beds" "because they [were] Jewish," the "rights to be free from racial violence, not to be terrorized, and to be secure in . . . personal effects and property" could not be used to support a Section 1985(3) claim). Yet these courts' analyses are less persuasive than those of courts coming to an opposite conclusion.

For example, in reaching its conclusion that Section 1985(3) may not be used to vindicate a right to be free from racial violence, the court in *Hogan* relied on the Supreme Court's decision in *Bray*. In interpreting *Bray*, the court in *Hogan* wrote that "the Supreme Court has thus far only found two rights protected under § 1985, neither of which is at issue here." *Hogan*, 2015 WL 1400496, at *12 (citing *Bray*, 506 U.S. at 278). But it appears to this Court that this overstates the upshot of *Bray*. In *Bray*, the Supreme Court considered whether the right to abortion, then conceived as "one element of a more general right of privacy or of Fourteenth Amendment liberty," could be used as a basis for a Section 1985(3) claim. *Bray*, 506 U.S. at 278 (citations omitted). It was in this context that the Supreme Court noted in *dicta* that Section 1985(3) "applies only to such conspiracies as are aimed at interfering with rights . . . protected against private, as well as official, encroachment," that there were "few such rights" and that the Supreme Court has "hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude, and, in the same Thirteenth Amendment context, the right of interstate travel." *Id.* (internal quotation marks omitted) (internal citations omitted). Nothing about *Bray*'s statement about which rights the

Supreme Court had "hitherto" recognized as predicating a 1985(3) claim suggests that the Supreme Court has *precluded* the lower courts from finding (subject to Supreme Court review, of course) that other rights can validly predicate a Section 1985(3) claim. And indeed, as discussed above with respect to a right against racial violence, and below with respect to a right to equal access to public accommodations, some lower courts *have* found other rights upon which a Section 1985(3) claim may be brought. *See e.g., Creek Red Nation, LLC v. Jeffco Midget Football Ass'n, Inc.*, 175 F. Supp. 3d 1290, 1295 (D. Colo. 2016) (citing *Life Ins. Co. of North Am. V. Reichardt*, 591 F.2d 499, 503 (9th Cir. 1979) (finding that the Supreme Court has interpreted Section 1985(3) "to protect the right to be free from racial discrimination"); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1006 (S.D. Tex. 1981) (finding that a conspiracy motivated by "class-based animus against Vietnamese persons" and aimed at limiting Vietnamese fishermen's access to waterways was actionable under Section 1985(3)).

As for the contrary decision in *Barry*, the district court there concluded with little analysis that in the context of "a Jewish family of three, asleep in their beds, ambushed because they [were] Jewish," there was no right to be free from "racial violence, not to be terrorized, and to be secure in . . . personal effects and property." *Barry*, 724 F. Supp. at 1102-03. The district court concluded, again without much analysis, that although the aforementioned rights are the "basic rights that the law secures to all free men," *id.* at 1103 (quoting *Griffin*, 403 U.S. at 105), they are "not among the rights the Constitution guarantees against *private* deprivation." *Id.* at 1103. The Court is not persuaded by *Barry*, especially given its dearth of reasoning, that a right to be free from racial violence is not cognizable under Section 1985(3). Instead, the Court concurs with the opinions discussed above that found to the contrary, as and for the reasons discussed above.

In summary, based on a reading of *Griffin*, *Scott*, and the persuasive analysis of recent district court opinions, the Court concludes that there is a Thirteenth Amendment right to be free from racial violence, and that Section 1985(3) may be used to vindicate that right.[14] Therefore, Plaintiff's Section 1985(3) claim may proceed on the theory that he suffered a denial of his right to be free from racial violence as a result of (and as a purpose of) Defendants' conspiracy.

---

[14] Defendant-Movants' arguments to the contrary are not persuasive.

First, Defendant-Movants take issue with Plaintiff's reliance on cases "upholding criminal hate crime laws under Congress's power per the Thirteenth Amendment," (Doc. No. 30 at 2), because, according to Defendant-Movants, "simply linking the Defendants[' conduct] to a criminal statute [i.e., the Hate Crimes Prevention Act, 18 U.S.C. § 249] hardly equates to violating the rights [sic]." (*Id.* at 4). Defendant-Movants' assertion here is unavailing for two reasons. First, Plaintiff relied on the referenced cases merely as support for the proposition that "[f]ederal courts across the country have recognized that the Enabling Clause [of the Thirteenth Amendment] provides congressional authority to curb racially-motivated violence under the Thirteenth Amendment," (Doc. No. 29 at 13), and second Plaintiff (and for that matter the Court) do not rely solely or even predominately on the Hate Crimes Prevention Act (or associated cases) for the proposition that a right to be free from racial violence may serve as a predicate right found in the Thirteenth Amendment to support Section 1985(3) claims.

Related to the above, Defendant-Movants also argue, seemingly with reference again to the Hate Crimes Prevention Act, that "Section 1985 claims should generally not try to piggyback off other statutes as a source of rights." (Doc. No. 30 at 4). Whether or not this is true is beside the point. Here, Plaintiff relies not on other statutes or the Hate Crimes Prevention Act, but rather on the Thirteenth Amendment as the source of Plaintiff's predicate rights,

Finally, Defendant-Movants assert baldly that *Kessler v. Sines* (discussed above) "wrongly assumed that [because] Congress had jurisdiction to pass criminal laws under Section 2 of the Thirteenth Amendment, then any such conduct would also violate Section 1." (Doc. No. 30 at 4). Defendant-Movants cite no authority to support this claim. Instead, they merely imply that because "[i]n *Kessler*, the jury awarded a large verdict on state-law charges, but hung on Section 1985" and "the trial court's Section 1985 ruling became moot — and never appealed," the Fourth Circuit was deprived of an opportunity to overturn a purportedly wrong assumption by the district court. (*Id.* at 4 n.3). True, *Kessler* was not ultimately subjected to appellate review, but that does not mean that it involved a "wrong assum[ption]" or otherwise is unpersuasive. And Defendant-Movants do nothing to substantively challenge the Court's above-stated view that *Kessler* is persuasive; not do they shake the Court's confidence in the persuasiveness of the other district court cases that found that a right to be free of race-based violence could predicate a Section 1985(3) claim.

ii. Thirteenth Amendment Right to Access Public Amenities and Public Accommodations

The Court likewise must determine whether there is a Thirteenth Amendment right to access public amenities and public accommodations and whether Section 1985(3) may be used to vindicate that right.

As Plaintiff acknowledges, "the Sixth Circuit has yet to consider whether the right to equal use and access to public amenities and places of public accommodations can serve as a predicate right for a private conspiracy claim under 1985(3)." (Doc. No. 29 at 14). Nevertheless, as Plaintiff argues, (Doc. No. 29 at 14-16), numerous other courts in considering this issue have found the denial of a right to equal use and access to public amenities and places of public accommodation to be an appropriate basis for a Section 1985(3) claim. (*Id.*).

Defendant-Movants assert that the "private, racist denial of access to public accommodations . . . does . . . not violate the Thirteenth Amendment," and that "Congress lacks any power under the [Thirteenth Amendment] to regulate" that kind of conduct. (Doc. No. 30 at 2) (citing *Civil Rights Cases*, 109 U.S. 3, 24-25 (1883)). In support of this assertion, Defendant-Movants quote, in full, the following passage from the *Civil Rights Cases*:

> After giving to these questions all the consideration which their importance demands, we are forced to the conclusion that such an act of refusal [of access to a public accommodation] has nothing to do with slavery or involuntary servitude, and that if it is violative of any right of the party, his redress is to be sought under the laws of the State; or, if those laws are adverse to his rights and do not protect him, his remedy will be found in the corrective legislation which Congress has adopted, or may adopt, for counteracting the effect of State laws, or State action, prohibited by the Fourteenth Amendment. It would be running the slavery argument into the ground to make it apply to every act of discrimination which a person may see fit to make as to the guests he will entertain, or as to the people he will take into his coach or cab or car, or admit to his concert or theater, or deal with in other matters of intercourse or business. Innkeepers and public carriers, by the laws of all the States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them. If the laws themselves make any unjust discrimination, amenable

to the prohibitions of the Fourteenth Amendment, Congress has full power to afford a remedy under that amendment and in accordance with it.

(Doc. No. 30 at 2) (quoting *Civil Rights Cases*, 109 U.S. at 24-25).

Defendant-Movants' argument on this point is unavailing because it (1) ignores Supreme Court precedent after the *Civil Rights Cases* that expanded the scope of congressional authority to regulate and proscribe badges of slavery under the Thirteenth Amendment; and (2) ignores myriad other case law establishing a right of equal access to public accommodations and amenities that is enforceable via Section 1985(3).

Beginning by addressing the first point, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court held that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 440. And in the wake of *Jones* and other Supreme Court case law[15] expanding the power of Congress to legislate under the Thirteenth Amendment, Courts of Appeals have recognized that "the Thirteenth Amendment can be seen as treating most forms of racial discrimination as badges and incidents of slavery, and that Congress not only has the power to *enforce* the amendment, but also to a certain extent to define its *meaning*." *United States v. Hatch*, 722 F.3d 1193, 1200 (10th Cir. 2013). Moreover, the Tenth Circuit, in interpreting *Jones*, has also noted that "[a]lthough the *Civil Rights Cases* have never

---

[15] In addition to *Jones*, the Supreme Court since the *Civil Rights Cases* has recognized the expansive power of Congress to legislate pursuant to the Thirteenth Amendment. *See e.g., Griffin*, 403 U.S. 88 at 105 ("We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men."); *Norwood v. Harrison*, 413 U.S. 455, 470 (1973) ("And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment."); *Runyon v. McCrary*, 427 U.S. 160, 179 (1976) (finding that Section 2 of the Thirteenth Amendment enables legislation prohibiting racial discrimination in private contracts).

been expressly overruled, [the *Jones*] Court . . . cast doubt on their present soundness." *Fisher v. Shamburg*, 624 F.2d 156, 160 (10th Cir. 1980). As the First Circuit put it subsequent to *Jones*, "Supreme Court caselaw has repeatedly reaffirmed that § 2 vests Congress with authority to legislate against racial discrimination and violence in a variety of contexts." *United States v. Diggins*, 36 F.4th 302, 308 (1st Cir. 2022) (collecting cases).

In line with the above, numerous other courts, recognizing the expanded scope of Congressional power under the Thirteenth Amendment, have found that a conspiracy to deprive someone of a right to access places of public accommodation constitutes a badge of slavery and may sustain a Section 1985(3) claim. The court in *Fisher v. Shamburg,* 624 F.2d 156 (10th Cir. 1980), found first that "Congress has declared its intention that a racially motivated interference with one's right to enjoy places of public accommodation constitutes . . . a badge of slavery," and accordingly that "a racially motivated conspiracy to interfere with one's enjoyment of a place of public accommodation constitutes a badge of slavery which is a deprivation of equal privileges and immunities under 42 U.S.C. § 1985(3)." *Id.* at 159, 162. The Tenth Circuit's holding is mirrored in numerous district courts around the country. For example, one district court found that "[t]he racially motivated deprivation of a person's use of public amenities, such as those provided by public parks, cafes, or public waterways, constitutes a badge of slavery and thus qualifies as a right protected by § 1985(3)." *Sealed Plaintiff 1 v. Patriot Front*, No. 3:22-CV-00670, 2024 WL 1395477, at *19 (E.D. Va. Mar. 31, 2024). And other courts have reached similar conclusions. *See e.g., N.D. Hum. Rights. Coal. v. Patriot Front*, No. 3:23-CV-160, 2024 WL 4120198, at *4 (D.N.D. Sep. 9, 2024) (finding allegations that defendants conspired to impede "the right to enjoy a public accommodation" sufficient to sustain a Section 1985(3) claim at the motion-to-dismiss stage); *Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 221 (D. Mass. 1995) (finding that "together

with the Thirteenth Amendment, section 1985(3) creates a remedy [proscribing] racially motivated conspiracies which, for example, interfere with a minority person's right to public accommodation."); *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1006 (finding conspiracy motivating by "class-based animus against Vietnamese person" to limit Vietnamese fishermen's access to public waterways actionable under Section 1985(3)). *Cf. United States v. Nelson*, 277 F.3d 164, 189 (2d Cir. 2002) ("It is important to understand that acts of violence or force committed against members of a hated class of people with the intent to exact retribution for and create dissuasion against their use of public facilities have a long and intimate historical association with slavery and its cognate institutions."). Accordingly, the Court finds that there is a right to access public accommodations rooted in the Thirteenth Amendment and that Section 1985(3) may be used to vindicate that right against private conspiracies.

Therefore, Count I may proceed on a theory that Plaintiff suffered a denial of his right to equal access of public accommodations as a result of (and as a purpose of) Defendants' conspiracy. Resisting this conclusion on yet another basis, Defendant-Movants argue that the Complaint "never really pleads a denial of said [public] accommodation." (Doc. No. 30 at 1). The Court disagrees, finding that Plaintiff has pled a deprivation of his right to use public accommodations or access public amenities in two ways. First, Plaintiff has pled such a deprivation via his allegations concerning the alleged racially motivated assault against Plaintiff on a public sidewalk and street. (Doc. No. 1 at ¶¶ 78-95). Second, and alternatively, Plaintiff has plausibly alleged such a deprivation through his allegations concerning Plaintiff's continued avoidance of "downtown Nashville [and the public accommodations and amenities therein] out of fear for several months"

after the attack on Plaintiff. (*Id.* at ¶ 96).[16] *Cf. Sealed Plaintiff 1*, 2024 WL 1395477 at *7, 11-12 (holding that the plaintiff had an injury sufficient to support standing to bring a Section 1985(3) claim, in part because the plaintiff alleged that as a result of the defendants' conspiracy to interfere with the enjoyment of a public park "without fear or intimidation on account of race," the plaintiff had self-imposed ongoing avoidance of that park).[17]

Therefore, reading the Complaint in a light most favorable to Plaintiff as required, the Court finds that Plaintiff has pled a denial of his right to equal access of a public amenity and public accommodation in the public sidewalks and public streets of Nashville, Tennessee. That is not to say that the Court at this juncture finds *as a matter of law* either that a public amenity and public accommodation *actually* was involved here or that Plaintiff *actually* was denied equal access to it here. But the Court need so find because, as the Court has taken pains to make clear, the issue on the instant Motion is only whether Plaintiff has set forth factual matter that plausibly suggests that such findings could be made in the instant case.

In sum, Plaintiff has a right to be free from racial violence and a right to equal use and access to public amenities and places of public accommodations. Because Plaintiff has alleged a conspiracy with the purpose of depriving him of the right to be free from racial violence and of depriving him of the right to equal access to public accommodations, such as to satisfy the second

---

[16] Lest there be any doubt, the Court notes that in this context, a public street and a public sidewalk constitute public accommodations and public amenities. The Court's understanding here is buttressed by decisions of other district courts that have found that deprivation of access to public accommodations and amenities like "public parks" and "public waterways," may sustain a Section 1985(3) claim. *Sealed Plaintiff 1*, 2024 WL 1395477, at *19; *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1006 (discussing access to public waterways in a Section 1985(3) context).

[17] The Court recognizes that in context *Sealed Plaintiff* addresses an issue not before the Court: standing. With that said, the Court still finds that *Sealed Plaintiff* supports the Court's view that ongoing avoidance of a public accommodation out of fear of racial violence may constitute a denial of that public accommodation so as to be actionable under Section 1985(3).

element of a Section 1985(3) claim, and because Plaintiff has alleged that as a result of that conspiracy he has suffered a deprivation of a right to be free from racial violence and deprivation of his right to equal access to public accommodations and amenities such as to satisfy the fourth element of a Section 1985(3) claim, Defendant-Movants' Motions will be denied with respect to Count One.

2. Count Two: Section 1986

Via Count Two, Plaintiff brings a claim under Section 1986 and alleges that Defendant GDL, Defendant Minadeo, Defendant McCann, Defendant Bysheim, Defendant Dunn, Defendant Morris, and Defendant Does 1-10 failed to prevent the conspiracy to deprive Plaintiff of his Thirteenth Amendment rights as detailed in Count One. (Doc. No. 1 at 28, ¶¶ 119-125).

Section 1986[18] "prohibits the aiding and abetting of violations of § 1985 and thus is derivative of § 1985." *Nicholson v. City of Westlake*, 76 F. App'x 626, 629 (6th Cir. 2003). Thus, "a plaintiff who fails to state a claim under [Section] 1985 also fails to state one under [Section] 1986." *Boddie v. Barstow*, No. 2:14-CV-106, 2014 WL 2611321, at *2 (S.D. Ohio May 2, 2014) (citing *Ruiz v. Hofbauer*, 325 F. App'x 427, 432 (6th Cir. 2009)).

Here, as to why Count Two should be dismissed, Defendant-Movants argue only that Count Two "is derivative upon the conspiracy in Count One." (Doc. No. 23 at 1). As explained in some

---

[18] This statute provides in pertinent part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action . . . .

42 U.S.C. § 1986.

detail above, the Court has determined that with respect to Count One, Plaintiff has stated a claim under Section 1985(3). Given that determination, Defendant-Movants' Motions to dismiss Count Two plainly must be denied. *See Wahi v. Charleston Area Med. Ctr.*, No. 2:04-CV-0019, 2004 WL 2418316, at *9 (S.D. W. Va. Oct. 27, 2004) (holding that because a plaintiff "allege[d] a claim under § 1985 upon which relief can be granted," a motion to dismiss a "§ 1986 claim . . . because it is dependent upon the existence of a valid § 1985 claim" must be denied).

    3.   <u>Counts Three, Four, and Five</u>

That leaves Plaintiff's state law-claims, which are for battery (Count Three), assault (Count Four), and malicious harassment (Count Five). With respect to those claims, Defendant-Movants' only argument for dismissal is that in the event the Court determines Plaintiff's federal claims in Counts One and Two fail, then "the failure" of those "federal claims also deprives the Court of subject-matter jurisdiction" (otherwise afforded to the Court via supplemental jurisdiction and 28 U.S.C. § 1367) over these purely state-law claims. (Doc. No. 23 at 9). As noted above, this is actually an argument not that subject-matter jurisdiction is lacking, but rather that subject-matter jurisdiction (here, supplemental jurisdiction) should be declined.

Here, as described at length above, with respect to each of his federal claims (Counts One and Two), Plaintiff states a claim upon which relief can be granted.[19] Thus, the necessary premise of Defendant-Movants' sole argument regarding the state-law claims is entirely undercut. Accordingly, Defendant-Movants' Motions with respect to Counts Three, Four and Five will be denied.

---

[19] The Court acknowledges that it is has "duty to consider" jurisdictional issues and may raise them "*sua sponte*." *Clark v. United States*, 764 F.3d 653, 657 (6th Cir. 2014). To the extent that there is doubt here, the Court can deduce no deficiencies in its choice to exercise supplemental jurisdiction over Plaintiff's state-law claims given that the federal claims are proceeding.

<u>CONCLUSION</u>

Accordingly, for the reasons described herein, Defendant-Movants' Motions (Doc. Nos. 22 and 28) will be **DENIED** in their entirety.

An appropriate corresponding order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE